PREET BHARARA
United States Attorney
Southern District of New York
By:     JACOB M. BERGMAN
Assistant United States Attorney
86 Chambers Street, 3rd Fl.
New York, NY 10007
Tel.: (212) 637-2776
Email: jacob.bergman@usdoj.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* Dr. PATRICIA A. KELLY, *et al.*,<br><br>            Plaintiffs,<br><br>      v.<br><br>CITY MEDICAL ASSOCIATES, P.C., ASIM HAMEEDI and ABSAR HAARIS,<br><br>            Defendants. | **COMPLAINT-IN-INTERVENTION OF THE UNITED STATES OF AMERICA**<br><br>15 Civ. 7261 (PGG) |
| UNITED STATES OF AMERICA<br><br>            Plaintiff-Intervenor,<br><br>      v.<br><br>CITY MEDICAL ASSOCIATES, P.C., DR. ASIM HAMEEDI, DR. ABSAR HAARIS, FAWAD HAMEEDI, ARIF HAMEEDI, and DR. EMAD SOLIMAN,<br><br>            Defendants. | 15 Civ. 7261 (PGG) |

The United States, by its attorney, Preet Bharara, United States Attorney for the Southern District of New York, alleges for its complaint as follows:

**PRELIMINARY STATEMENT**

1.      This is a civil fraud action brought by the United States (the "Government")

against City Medical Associates, P.C. ("CMA"), Dr. Asim Hameedi, Dr. Absar Haaris, Fawad Hameedi (collectively with Dr. Asim Hameedi and CMA, the "CMA Defendants"), Arif Hameedi and Dr. Emad Soliman (collectively with the CMA Defendants, "Defendants"), under the False Claims Act (the "FCA"), 31 U.S.C. §§ 3729-3733, to recover treble damages sustained by, and civil penalties owed to, the Government as result of numerous fraudulent schemes including, but not limited to, Defendants' billing federal healthcare programs for services that were not rendered, were not medically necessary, were submitted with provider numbers of physicians who did not work for CMA, or were tainted by violations of the Anti-Kickback Statute (the "AKS"), 42 U.S.C. § 1320a-7b(b).

2. CMA is a cardiology and neurology practice located in Queens, New York. From at least 2003 through November 2015, the CMA Defendants have used CMA as a vehicle to defraud federal heathcare programs, including Medicare and Medicaid, of millions of dollars, while giving little regard to their patient's well-being. As set forth more fully below, the CMA Defendants: (1) billed the Government for nuclear stress tests that were never performed; (2) falsified the results of nuclear stress tests in order to justify, and bill the Government for, invasive cardiac catheterizations that were not medically necessary; (3) performed and billed the Government for medically unnecessary neurological tests; (4) with the assistance of Arif Hameedi, paid cash to primary care providers in order to induce them to refer patients to CMA; and (5) billed the Government for various purported medical services using the provider numbers of multiple physicians who did not actually work at CMA. With respect to this last scheme, one such physician, Emad Soliman, a neurologist practicing in Yonkers, New York, allowed the CMA Defendants to use his provider number to bill for neurological tests that he did not perform, order, or review in exchange for the CMA Defendants paying for his health insurance.

**JURISDICTION AND VENUE**

3. This Court has jurisdiction over the claims brought under the False Claims Act pursuant to 31 U.S.C. § 3730(a) and 28 U.S.C. §§ 1331 and 1345.

4. Venue lies in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b) and 1391(c) because Defendants reside and transact business in this district.

**PARTIES**

5. Plaintiff is the United States of America suing on its own behalf and on behalf of the United States Department of Health and Human Services ("HHS"), and its component agency, CMS, which administers the Medicare Program and is responsible for overseeing the Medicaid programs.

6. Defendant City Medical Associates, P.C. is a cardiology and neurology medical practice with its principle office at 216-04 Union Turnpike, Bayside, New York, 11364.

7. Defendant Asim Hameedi, M.D. is an interventional cardiologist who, at all relevant times, was the owner and Chief Executive Officer of CMA. Dr. Hameedi resides in New York, New York.

8. Defendant Absar Haaris, D.O. is a doctor of osteopathy specializing in family medicine who, at all relevant times, was the Principal Executive Officer of CMA and was responsible for its day-to-day operations. Dr. Haaris resides in New York, New York.

9. Fawad Hameedi is a nephew of Asim Hameedi. During the relevant time period, he represented himself to be a Laboratory Director and Practice Operations Manager at CMA. While Fawad Hameedi graduated from medical school in or about 2010, he has never been licensed to practice medicine in New York or any other state. Fawad Hameedi resides in Hicksville, New York.

10. Defendant Emad Soliman, M.D. is a neurologist. Between 2001 and 2004, he worked part-time at CMA. He is presently the Chief of Neurology at Westchester Neurological Consultants, located at 970 N. Broadway, Suite 107, Yonkers, New York. Dr. Soliman resides in Mt. Kisco, New York.

11. Arif Hameedi is a brother of Asim Hameedi. At all relevant times, Arif Hameedi was responsible for, among other things, the electronic submission of bills and/or claims by CMA to health insurance companies and federal heathcare programs, such as Medicare and Medicaid. Arif Hameedi was paid for these services through various companies that he owned and controlled. Arif Hameedi resides in Oakland Gardens, New York.

## FACTS

### I. Federal Health Care Programs

#### A. The Medicare Program

12. In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare program, to pay for the costs of certain healthcare services. Entitlement to Medicare is based on age, disability or affliction with end-stage renal disease. *See* 42 U.S.C. §§ 426, 426A. The Department of Health and Human Services (HHS) is responsible for the administration and supervision of the Medicare program. The Centers for Medicare and Medicaid Services (CMS) is an agency of HHS and is directly responsible for the administration of the Medicare program.

13. Medicare has several parts, including Part A (which is primarily for hospital based charges) and Part B (which is primarily for physician and other ancillary services). Claims for Medicare Part B services are submitted on CMS form 1500.

14. Medicare prohibits payment for services that are not "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed


body member." 42 U.S.C. § 1395y (a)(l)(A).  For most services, the reasonable charge has been defined as the lowest of (a) the actual billed charge, (b) the provider's customary charge, or (c) the prevailing charge for the service in the locality.  42 C.F.R. §§ 405.502-504.

15.     Further, Medicare enters into agreements with physicians to establish the physician's eligibility to participate in the Medicare program.  For physicians to be eligible for participation in the Medicare program, they must certify that they agree to comply with the Anti-Kickback Statute, among other federal health care laws.  Specifically, on the Medicare enrollment form, CMS Form 855I, the "Certification Statement" that the medical provider signs states: "You MUST sign and date the certification statement below in order to be enrolled in the Medicare program.  In doing so, you are attesting to meeting and maintaining the Medicare requirements stated below."  Those requirements include:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to me . . . The Medicare laws, regulations and program instructions are available through the fee-for-service contractor.  I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.
>
> *****
>
> I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

### B. The Medicaid Program and Prepaid Healthcare Service Plans

#### 1. The Medicaid Program

16. Pursuant to the provisions of Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.*, the Medicaid program was established in 1965 as a joint federal and state program created to provide financial assistance to individuals with low incomes to enable them to receive medical care. Under Medicaid, each state establishes its own eligibility standards, benefit packages, payment rates and program administration in accordance with certain federal statutory and regulatory requirements. The state directly pays the health care providers for services rendered to Medicaid recipients, including prescription drugs, with the state obtaining the federal share of the Medicaid payment from accounts which draw on the United States Treasury. *See* 42 C.F.R. §§ 430.0 *et al.* The federal portion of each state's Medicaid payments, known as the Federal Medical Assistance Percentage ("FMAP"), is based on the state's per capita income compared to the national average. *See* 42 U.S.C. § 1396d(b).

17. Providers who participate in the Medicaid program must sign enrollment agreements with their states that certify compliance with the state and federal Medicaid requirements. Although there are variations among the states, the agreement typically requires the prospective Medicaid provider to agree that he or she will comply with all state and federal laws and Medicaid regulations in billing the state Medicaid program for services or supplies furnished.

18. Furthermore, in many states, Medicaid providers, including both physicians and pharmacies, must affirmatively certify, as a condition of payment of the claims submitted for reimbursement by Medicaid, compliance with applicable federal and state laws and regulations.

19. In New York, physicians and pharmacies must periodically sign a "Certification

6

Statement for Provider Billing Medicaid," in which the provider certifies that claims submitted "to the State's Medicaid fiscal agent, for services or supplies furnished," "will be subject to the following certification. . . . I (or the entity) have furnished or caused to be furnished the care, services, and supplies itemized and done so in accordance with applicable federal and state laws and regulations."

### 2. Prepaid Healthcare Service Plans

20.     The New York State Legislature established New York's Medicaid system in 1966, *see* Act of Apr. 30, 1966, ch. 256, 1966 N.Y. Laws 844, the year after Congress created the federally funded Medicaid program, *see* Social Security Amendments of 1965, Pub. L. No. 89-97, 79 Stat. 344 (1965).  Under this system, Medicaid is administered at the state level by the New York State Department of Health ("DOH").  *See* N.Y. Pub. Health Law § 201(1)(v).

21.     Section 1932 of the Social Security Act gives states the option to use Medicaid Managed Care Organizations ("MCO(s)") to deliver Medicaid benefits and to require that individuals enroll with an MCO as a condition of receiving benefits.  *See* 42 U.S.C. § 1396u–2(a)(1)(A).  Pursuant to Title 11 of Article 5 of the New York Social Services Law, New York State established a managed care program under the medical assistance program, known as the Medicaid Managed Care ("MMC") Program.  *See* N.Y. Soc. Serv. Law § 364–j.

## II.     Applicable Statutes

### A.  False Claims Act

22.     The FCA establishes liability to the United States for any person who "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1), or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or

fraudulent claim," § 3729(a)(1)(B). "Knowingly" is defined to include actual knowledge, reckless disregard, and deliberate indifference. *Id.* § 3729(b). No proof of specific intent to defraud is required. *Id.*

23. Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 64 Fed. Reg. 47099, 47103 (1999), the civil penalty per false claim for violations occurring after September 29, 1999 and before August 1, 2016, ranges from $5,500 to $11,000.

### B. The Anti-Kickback Statute

24. The AKS arose out of congressional concern that remuneration given to those who can influence healthcare decisions would result in goods and services being provided that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population. To protect the Medicare and Medicaid programs, among other federal healthcare programs, from these harms, Congress enacted a prohibition against the payment of kickbacks in any form. First enacted in 1972, Congress strengthened the statute in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient Program Protection Act of 1987, Pub. L. No. 100-93.

25. The AKS makes it illegal for individuals or entities to knowingly and willfully "offer[] or pay[] remuneration (including any kickback, bribe, or rebate) . . . to any person to induce such person . . . to purchase, . . . order, . . . or recommend purchasing . . . or ordering any good . . . or item for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(2). Violation of the AKS is a felony punishable by fines

and imprisonment and can also result in exclusion from participation in federal health care programs. 42 U.S.C. § 1320a-7b(b)(2); 42 U.S.C. § 1320a-7(b)(7).

26. Compliance with the AKS, 42 U.S.C. § 1320a-7b(b), is a condition of payment under the federal health care programs.

### III. Proper Performance of and Billing for Cardiology and Neurological Procedures Under Federal Healthcare Programs

#### A. CPT Codes

27. In order to receive reimbursement payments from the Government for medical services covered by federal healthcare programs, a provider must submit claims for payment containing Current Procedural Terminology ("CPT") codes. These codes are a set of standardized medical codes developed and maintained by the American Medical Association. CPT codes are used to describe and report medical, surgical and diagnostic procedures and services to public and private health insurance programs for medical billing purposes.

28. The United States uses CPT codes to determine both coverage, *i.e.*, if it will pay for the billed medical procedures and services, and reimbursement, *i.e.*, how much it will pay for the billed medical procedures and services.

29. There are thousands of CPT codes and each procedure or service or item furnished to a patient has a specific CPT code. Further, each CPT code receives a certain level of reimbursement, which can vary depending on what other codes are billed. The amount of money a physician or medical provider is paid for his or her services by Medicare or Medicaid depends on which CPT codes are used.

30. When a medical provider sees a patient, he or she typically uses a "superbill" to code which services were performed. A superbill is an itemized form used by medical practitioners to quickly record the procedures and diagnosis for a patient visit. It is then used as

the data source for a reimbursement claim submitted to an insurer such as Medicare or Medicaid. The superbill is generally customized for a provider's office and contains, among other information, the most common CPT codes used by that office.

31.  CMA used superbills to record patient diagnoses and procedures and submit claims for reimbursement. The physician would complete the superbill and then provide it to an employee in the billing department, who would submit a claim for reimbursement, often to Medicaid, Medicare or a MCO, for the services reflected on the superbill. The services for which reimbursement were sought had a unique identification number, known as a National Provider Identification number ("NPI"), which belongs to the physician who purportedly rendered the services in question.

### B.  Nuclear Stress Tests

32.  A Nuclear Stress Test ("NST") is a diagnostic test used to evaluate blood flow to the heart at rest and also while the heart is stressed as a result of exercise or medication. The test typically involves taking two sets of images of the heart, one at rest and one after the heart has been stressed.

33.  Prior to the test beginning, a patient will be injected with a small amount of radioactive dye such as technetium. Then images of the heart will be taken while at rest. After the images have been taken, the patient will exercise or be given medication to stimulate the heart and will be injected with additional radioactive dye. Images will once again be taken of the heart. The two sets of images allow a doctor to compare the blood flow through the heart while at rest and at stress to help determine if the heart is enlarged and can measure pumping function.

34.  Physicians typically use three CPT codes when billing for this procedure. One CPT code is used to bill for the imaging, another is used to bill for the dye, and a third is used to

bill for the physician's supervision of the test.

35. With respect to the billing for imaging, physicians are required to use code 78451 and 78453 when only one set of images is taken, either at rest or at stress. A physician may only use code 78452 when two sets of images are taken.

36. With respect to the dye, code A9500 is used for each per study dose. Accordingly, if both a stress and rest test are performed, two doses of dye would be administered and two units of A9500 would be billed.

37. Finally, with respect to the physician supervision, a physician may only use code 93015 if he or she has supervised the test, interpreted the results, and owns the equipment that was used to perform the test.

### C. Cardiac Catheterization

38. An abnormal finding during an NST can lead to a cardiac catheterization. This procedure is more invasive and is typically performed in a hospital. It involves inserting a thin tube, called a catheter, into an artery or vein and threading it through the blood vessels to the heart. Using this catheter, doctors can perform diagnostic tests and treatments on the heart.

### D. Nerve Conduction Velocity

39. Nerve Conduction Velocity ("NCV") is a test that evaluates how fast an electrical signal moves through a nerve, which can determine nerve damage. During the test, two electrode patches are placed on the patient's skin over the nerve. The nerve is then stimulated by one of the patches and the electrical activity is recorded when it reaches the second patch. The nerve conduction velocity is calculated by measuring the time it takes for the electrical impulses to travel through the nerve between the two electrode patches.

## IV. Defendants' Fraudulent Conduct

### A. Billing for Services Not Rendered

40.     Since at least 2009, the CMA Defendants routinely billed the Government and MCOs for both the stress and resting portion of a NST despite the fact that only the stress portion of the test was performed.  In fact, the customized superbill used by CMA, and created under the supervision of Dr. Haaris and Dr. Hameedi, only contained the code 78542 under the category Nuclear Studies.  Therefore, CMA providers were required to indicate that they performed both a resting and stress study, even if they performed only one portion of the study.  Furthermore, CMA, with the knowledge and consent of the CMA Defendants, billed the Government and MCOs for two doses of the dye used in NSTs, when only a stress or resting portion of the test was performed and, accordingly, only one dose of dye was used.

41.     Examples of this conduct are as follows:

    (a) On March 25, 2011, Patient A received a NST at CMA.  The images from this study demonstrate that only one portion of the study (either the stress or resting) was performed and, therefore, only one dose of dye was used.  However, CMA billed the Government for both the stress and resting portion of the NST and billed the Government for two doses of dye.

    (b) On June 13, 2012, Patient B received a NST at CMA.  The images from this study demonstrate that only one portion of the study (either the stress or resting) was performed and, therefore, only one dose of dye was used.  However, CMA billed the Government for both the stress and resting portion of the NST and billed the Government for two doses of dye.

    (c) On March 23, 2013, Patient C received a NST at CMA.  The images from this

12

        study demonstrate that only one portion of the study (either the stress or resting) was performed and, therefore, only one dose of dye was used. However, CMA billed the Government for both the stress and resting portion of the NST and billed the Government for two doses of dye.

    (d) On September 24, 2014, Patient D received a NST at CMA. The images from this study demonstrate that only one portion of the study (either the stress or resting) was performed and, therefore, only one dose of dye was used. However, CMA billed the Government for both the stress and resting portion of the NST and billed the Government for two doses of dye.

    (e) On August 23, 2015, Patient E received a NST at CMA. The images from this study demonstrate that only one portion of the study (either the stress or resting) was performed and, therefore, only one dose of dye was used. However, CMA billed the Government for both the stress and resting portion of the NST and billed the Government for two doses of dye.

    42. The Government would not have paid for these claims had it known that it was being billed for services that were not rendered and drugs that were not administered.

### B. City Medical Associates Altered the Results of NSTs in Order to Obtain Approval to Perform Cardiac Catheterizations.

    43. Many of the patients who received NSTs were also given cardiac catheterizations. While some of these patients required this more invasive procedure, others had normal results from their NSTs but were recommended for this inpatient procedure anyway. To justify to MCOs that these procedures were medically necessary, the CMA Defendants directed Jenesse Baker, a physician assistant at CMA, to falsify the results of NSTs in order to obtain prior authorization from MCOs for cardiac catheterizations.

44.     More specifically, since at least 2010, Ms. Baker, at the direction of the CMA Defendants, would change the results of NSTs from a finding of "normal" to a finding of "abnormal" and would indicate that the patient had a "reversible defect" – also known as ischemia.  A finding of a "reversible defect" indicates that areas of the heart are getting reduced blood flow, potentially as a result of narrowed arteries, thereby justifying the more invasive cardiac catheterization.  Without an abnormal finding on a NST, many MCOs would not approve a cardiac catheterization.  Accordingly, as Ms. Baker stated, she needed to "finagle stuff just so they get approval."

45.     These MCOs would not have paid for these claims had they known that such procedures were medically unnecessary and the approval of such procedures was predicated on misrepresentations.

### C. City Medical Associates Performed and Ordered Medically Unnecessary Nerve Conduction Velocity Tests

46.     In addition to fraudulently billing for cardiac procedures like NSTs, the CMA defendants also fraudulently billed for neurological procedures.  In 2011 and 2012, Dr. Hameedi and Dr. Haaris, neither of whom is a neurologist, ordered neurological tests for patients despite knowing that these tests were medically unnecessary.  More specifically, Dr. Haaris and Dr. Hameedi ordered, and billed for, NCVs for patients who showed no signs of suffering from neurological deficiencies thereby requiring such tests.  The results of these tests were often not reviewed by a doctor, nurse or physician assistant.

47.     The Government would not have paid for these claims had it known that these procedures were medically unnecessary.

### D. City Medical Associates Billed for Procedures Using the NPIs of Doctors Who Did Not Work at City Medical Associates

48. The CMA Defendants routinely submitted claims to Medicaid, Medicare and MCOs for NSTs and NCVs, along with other procedures, under the NPIs of physicians who did not work for CMA. Specifically, the CMA Defendants used the NPIs belonging to Dr. Rajiv Jauhar, Dr. Joseph McCarthy and Dr. Emad Soliman despite the fact these individuals either no longer worked at CMA or never worked at CMA.

49. With respect to Dr. Jauhar and Dr. McCarthy, such billings took place without these doctors' consent. CMA began using the NPIs belonging to Dr. McCarthy and Dr. Jauhar without their consent in 2004 and 2007, respectively. The following are examples of such fraudulent billings:

  (a) On or about July 11, 2013, the CMA Defendants billed an MCO for an NST using Dr. Jauhar's NPI, despite the fact that he neither performed, supervised or ordered this procedure.

  (b) On or about October 23, 2014, the CMA Defendants billed Medicare for an echocardiogram using Dr. Jauhar's NPI, despite the fact that he neither performed, supervised or ordered this procedure.

  (c) On or about October 21, 2010, the CMA Defendants billed an MCO for a NST using Dr. McCarthy's NPI, despite the fact that he neither performed, supervised or ordered this procedure.

  (d) On or about November 4, 2011, the CMA Defendants billed an MCO for a NST using Dr. McCarthy's NPI, despite the fact that he neither performed, supervised or ordered this procedure.

50. Dr. Soliman, on the other hand, consented to the CMA Defendants use of his NPI

to bill the Government and MCOs for neurological tests he did not perform, supervise or order. For instance, on or about September 8, 2014, CMA billed Medicare $600 under CPT code 93925 using Dr. Soliman's provider number. However, these services were not rendered by Dr. Soliman. In exchange, CMA paid for Dr. Soliman's health insurance. This arrangement began in 2011 and continued through 2015.

51. The Government would not have paid these claims had it known that the services forming the basis of these claims were performed, supervised or ordered by other doctors.

### E. The CMA Defendants Paid Kickbacks to Doctors and Their Staff in Exchange for Patient Referrals.

52. Many of the patients seen by the CMA Defendants were referred by physicians who received kickbacks from Dr. Haaris, Dr. Hameedi or Fawad Hameedi. Often, these kickbacks were cash payments delivered by Dr. Haaris or Fawad Hameedi, at the direction of Dr. Hameedi, to primary care physicians throughout Queens, New York, in order to induce them to refer patients to CMA, many of whom were covered by Medicaid, an MCO or Medicare. This practice began as late as 2006 and continued through at least 2015. Examples of this conduct include:

(a) Between 2006 and 2015, Dr. Hameedi directed Dr. Haaris to pay Dr. X, a primary care physician in Queens, New York, $175 for each patient that this doctor referred to CMA. These payments were made in cash at the end of each month and often totaled close to $4,000.

(b) Between 2006 and 2015, Dr. Hameedi directed Dr. Haaris to pay Dr. Y, a primary care physician in Queens, New York, as much $150 in cash for each patient that this doctor referred to CMA. Moreover, Dr. Hameedi also directed Dr. Haaris to pay the staff at this practice in order to ensure that CMA

received referrals. On December 22, 2014, Dr. Hameedi sent a text message to Dr. Haaris concerning this office which stated that the "office manager needs to be taken care off [sic]." Approximately two weeks later, on January 5, 2015, Dr. Hameedi followed up with Dr. Haaris and sent him a text message stating, "take care of his staff as well."

53. In order to hide the large cash withdrawals used to pay these kickbacks, the CMA Defendants and Arif Hameedi agreed that checks would be issued from a bank account in the name of CMA to various business accounts owned and controlled by Arif Hameedi. In turn, Arif Hameedi would then withdraw most of those funds from his accounts and provide that cash to Dr. Haaris, Dr. Hameedi or Fawad Hameedi, who would use the cash to pay these kickbacks. Arif Hameedi kept a small portion of the money for himself.

54. The Government would not have paid for these claims had it known that such claims were induced through kickbacks.

## CLAIM FOR RELIEF

## FIRST CLAIM

**FALSE CLAIMS ACT: PRESENTING FALSE CLAIMS FOR PAYMENT (31 U.S.C. § 3729(a)(1) (2000), and, as amended, 31 U.S.C. § 3729(a)(1)(A))**

55. The Government incorporates by reference paragraphs 1 through 54 above as though fully set forth in this paragraph.

56. The Government seeks relief against Defendants under Section 3729(a)(1) of the False Claims Act, 31 U.S.C. § 3729(a)(1) (2000), and, as amended, 31 U.S.C. § 3729(a)(1)(A).

57. Through the acts set forth above, Defendants knowingly, or acting with deliberate ignorance or reckless disregard for the truth, presented, or caused to be presented, false or fraudulent claims for payment to Medicare and Medicaid relating to cardiology and neurology

services.

58. The Government made payments to MCOs and the CMA Defendants under the Medicaid and Medicare programs because of the false or fraudulent claims.

59. By reason of these false claims, the Government has sustained damages in a substantial amount to be determined at trial, and is entitled to a civil penalty as required by law for each violation.

## SECOND CLAIM

### FALSE CLAIMS ACT: USE OF FALSE STATEMENTS
### (31 U.S.C. § 3729(a)(1)(B))

60. The Government incorporates by reference paragraphs 1 through 54 above as though fully set forth in this paragraph.

61. The Government seeks relief against Defendants under Section 3729(a)(1)(B) of the False Claims Act.

62. Through the acts set forth above, Defendants knowingly, or acting with deliberate ignorance or reckless disregard for the truth, made, used, and caused to be made and used, false records and statements material to false or fraudulent claims in connection with the sale of medications.

63. The Government made payments to MCOs and the CMA Defendants under the Medicaid and Medicare programs because of the false or fraudulent claims.

64. By reason of these false claims, the Government has sustained damages in a substantial amount to be determined at trial, and is entitled to a civil penalty as required by law for each violation.

## **THIRD CLAIM**

### **UNJUST ENRICHMENT**

65. The Government incorporates by reference paragraphs 1 through 54 above as though fully set forth in this paragraph.

66. By receiving payments from the Government and MCOs based on the foregoing conduct, the CMA Defendants were unjustly enriched. The circumstances of the receipt of these payments are such that, in equity and good conscience, the CMA Defendants should not retain these payments, the amount of which is to be determined at trial.

WHEREFORE, plaintiff the Government requests that judgment be entered in its favor and against Defendants as follows:

    (a)    On the First and Second Claims for relief (violations of the FCA, Section 3729(a)(1) (2000), and, as amended, 31 U.S.C. § 3729(a)(1)(A), and Section 3729(a)(1)(B)), for treble the United States' damages, in an amount to be determined at trial, plus an $11,000 penalty per violation of the FCA;

    (b)    On the First and Second Claims for relief, an award of costs pursuant to 31 U.S.C. § 3729(a);

    (c)    On the Third Claim for Relief (Unjust Enrichment), in an amount to be determined at trial, together with costs and interest; and

   (e)  Granting the Government such further relief against Defendants as the Court may deem proper.

Dated:  New York, New York
     March 1, 2017

              Respectfully submitted,

              PREET BHARARA
              United States Attorney for the
              Southern District of New York
              Attorney for the United States

           By:  */s/ Jacob M. Bergman*
              JACOB M. BERGMAN
              Assistant United States Attorney
              86 Chambers Street, 3d Floor
              New York, NY  10007
              Tel.:  (212) 637-2776
              Fax:  (212) 637-2686
              Email:  Jacob.bergman@usdoj.gov